*In The Estate of Theresa Ruth Steiner,* No. 757, September Term 2021.  Opinion by Meredith, Timothy E., J.

**ESTATES AND TRUSTS – WILLS AND CODICILS – STATUTORY REQUIREMENTS FOR PROPER EXECUTION – BURDEN OF PROOF.**  Section 4-102(b) of the Estates and Trusts Article of the Maryland Code provides that, with certain exceptions, the proper execution of a will (or codicil) in Maryland requires that the will or codicil be: in writing; signed by the testator (or by some other person for the testator, in the testator's physical presence and by the testator's express direction); and attested and signed in the physical presence of the testator by two or more credible witnesses.  A "presumption of due execution" attaches to a will or codicil if the witnesses subscribe to an attestation clause that affirms compliance with these statutory requirements.  But, even in the absence of a proper attestation clause signed by the witnesses, the presumption of due execution can also attach if a proponent of a testamentary document can adduce sufficient evidence, either from the document itself, or from the surrounding circumstances, or a combination of the document and surrounding circumstances, to persuade the court that there is a prima facie case that the statutory requirements for the execution of a will have been satisfied.  If a presumption of due execution attaches to a will or codicil, then the opponent of the testamentary document bears the burden of proving by clear and convincing evidence that the statutory requirements for a valid will were not satisfied.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 757

September Term, 2021

_____


IN THE ESTATE OF
THERESA RUTH STEINER


_____

Nazarian,
Zic,
Meredith, Timothy E.
        (Senior Judge, Specially Assigned),


JJ.
_____

Opinion by Meredith, J.
_____

Filed:  July 28, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In handwritten "amendments" to her Last Will and Testament (the "Will"), a terminally ill testator revoked certain bequests she recently had made to her only child. This appeal challenges the denial of a petition to caveat that holographic codicil (the "Codicil") of Theresa Ruth Steiner (the "Testator" or "Testatrix"). The disputed Codicil revoked the Testator's bequest of a life estate in her real property to appellant, Harold Steiner (the "Caveator"), who was the Testator's only child. The Codicil also limited other bequests of personal property to him and removed him as a beneficiary of her residuary estate. These changes inured to the benefit of others, including Krystal Renee Steiner Vogtman, who is the Caveator's daughter and a personal representative of the Estate of Theresa Ruth Steiner (the "Estate," appellee).

The Orphans' Court for Garrett County denied the Caveator's challenge to the Codicil. When the Caveator appealed, the Circuit Court for Garrett County reviewed his caveat petition *de novo*. The circuit court held that the Codicil was facially valid and that the Caveator failed to prove that it was not a valid instrument. The Caveator then filed an appeal to this Court.

In this appeal, the Caveator contends that the circuit court erred in (1) "placing the burden of proving the invalidity of the Codicil on [him] despite the Codicil not containing an attestation clause[,]" and (2) "relying upon the prior finding of the Orphans' Court that the Codicil was valid when it denied [his] Motion to shift the burden to" the Estate. For reasons that follow, we disagree with both contentions of error and affirm the judgment.

*The Will and Codicil*

On February 5, 2020, the Testator signed her Will.  At that time, she was being treated for metastatic cancer.

In her Will, the Testator made specific bequests to the Caveator and others.  Using a typed "RocketLawyer.com" form, the Testator bequeathed to the Caveator a life estate in her real property at "3905 Fairview Rd. Grantsville Md. 21536[,]" $15,000 from a bank safe deposit box, a motorcycle, a truck, a joint interest in proceeds from the sale of her "collectables[,]" and a secondary interest in her coin collection.  After giving the remainder interest in that real property and certain other items of personal property to others, the Testator bequeathed both her "remaining tangible personal property" and her residuary estate equally to the Caveator and Testator's granddaughter, Krystal Vogtman.  The Testator nominated both Ms. Vogtman and Nellie A. Herget of Essex to serve "as Co-Executors[.]"

The Will was signed by the Testator, two witnesses, and Joanne M. Hunton, a Notary Public in Harford County.  Both witnesses—Ginger D. Herget and Adrian Herget—signed beneath an attestation clause "certify[ing] that" they and the Testator signed "the above instrument, which consists of 5 pages, including the page[] which contain[s] the witness signatures," in the "sight and presence" of each other.

The disputed Codicil purporting to amend the Will indicates that it was executed four months later on June 5, 2020.  Handwritten in block letters on two sheets of lined notebook paper, marked "PAG [sic] 1 of 2" and "PAGE 2 of 2," the Codicil begins:

Amendments to
Last Will and Testament of
Theresa R.B. Steiner
Dated February 5, 2020

Article III
D[i]sposition of Property

I revoke Lifetime Living Rights To 3905 Fairview Road Grantsville, MD 21536 along with $15,000 from safe deposit box . . . , all equipment to Harold W. Steiner (Buddy)[.] He will still receive the 2009 F150 Truck and Harley Davidson and Business Tools.

In addition to those changes, the Codicil altered the Testator's bequests for her coin collection, safe deposit box, collectables, "remaining tangible personal property[,]" and "risiduary estate" [sic] by eliminating the Caveator as a primary or secondary beneficiary.

On the second page of the Codicil, following the last two amendments to the Testator's Will, are the words: "In Witness Whereof, I have subscribed my name below, This 5th day of June, 2020." Beneath that appear three signatures next to three labels: one stating "Testator Signature" and two that say "Witness Signature[.]" The signatures on the witness lines are "Adrian Herget" and "Alexis Matters." In addition, to the left of those signature blocks, there is a signature and seal of "Ginger D. Herget[,]" as a Baltimore County Notary Public. (Ginger D. Herget had been one of the two witnesses to the Will executed on February 5, 2020, as had Adrian Herget.)

### Proceedings in Orphans' Court

The Testator died on September 1, 2020. Krystal Vogtman and Nellie Herget (the "Personal Representatives") were appointed Co-Personal Representatives. In the Orphans' Court for Garrett County, they filed both the Will and the Codicil.

3

The Caveator challenged the Codicil, but *not* the Will, alleging that, on June 5, 2020, the Testator "was not mentally competent or coherent at the time this Codicil was written and did not possess the requisite capacity to make amendments to her Will, dated 5 February 2020." In addition, the Caveator asserted, "[t]he Testator's declining physical and mental health produced a substantial weakness" that allowed "interested persons with . . . no ties of blood" to exercise "[u]ndue [i]nfluence" to "disinherit[] all individuals who were intended to inherit the estate[.]" Finally, the Caveator alleged "[f]raud" because he did "not believe that [the Testator] was physically present with the two witnesses when she signed the Codicil" and "the person who notarized this document is the natural daughter of the Executor of the Will, Nellie Herget."

The Personal Representatives filed a written opposition, asserting:

During the time the amendment was made on Friday June 5, 2020 my Grandmother was in her right state of mind. The reason that she changed her will was due to the ongoing harassment that she rec[ei]ved from [the Caveator]. These were my Grandmother's wishes and there was no fraud conducted.

The orphans' court, in its written order denying the Caveator's petition, found that the burden of proving "testamentary incapacity was not met by the" Caveator and that the Testator "drove approximately three hours, from Grantsville, MD to Essex, MD, and had ample time in which to contemplate her actions before signing the Codicil." Her "medical condition, although deteriorating near the time of her death, does not reflect her mental capacity on the specific date at which she made the decision to sign the Codicil." The orphans' court determined that, "on the date of the signing of the Codicil," "the Testatrix met the requirements of testamentary competency."

4

### *Proceedings in Circuit Court*

The Caveator appealed that decision to the Circuit Court for Garrett County. In *de novo* proceedings that were heard on July 12, 2021, the circuit court reviewed the Will and Codicil that had been transmitted from the orphans' court.

The Caveator and his fiancée testified in support of his challenge to the Codicil. The Caveator, the only child of the Testator, testified that he grew up "between Grantsville and Essex, fifty-fifty." He noted that, before his mother's death on September 1, 2020, she suffered from cancer for "[a] good five years."

On August 24, 2020, while the Testator was hospitalized, the Caveator "check[ed] on the estate" and "noticed that the window was open," which looked to him "like a staged break-in" because "[t]hings was [sic] moved around, missing this and that." He found among the Testator's papers another handwritten document that bears her signature but is not dated and not signed by any witnesses. Except for those omissions, this document appears to be identical to the Codicil that was signed and witnessed on June 5, 2020, in format, handwriting, and even spelling errors (*e.g.*, "PAG" and "risiduary").

When the Caveator was shown the signed, dated, and witnessed Codicil that the orphans' court admitted to probate, he acknowledged that it has "a notary seal" of Ginger Herget, the daughter of Nellie Herget (who is one of the Personal Representatives for the Estate and a former "co-worker of" the Testator). The probated Codicil also has witness signatures by "Alexis Matters[,]" whom the Caveator knew to be living "down in . . . Baltimore[,]" and "Adrian Herget," whom the Caveator knew to be living in "Hyde

5

Park[.]" (As noted above, Adrian Herget had also been one of the witnesses on the Will executed on February 5, 2020.)

According to the Caveator, the drive from Grantsville to Essex "where these people purportedly were" would take "three and a half hours[.]" Given the Testator's age and worsening medical condition, however, she could not drive herself. The Caveator argued that she would not have been able to tolerate such an "arduous" trip.

On cross-examination, the Caveator acknowledged he was not contesting the orphans' court's finding that, on February 5, 2020, four months before the date of the June 5 Codicil, the Testator signed her Will, nor that that document was witnessed by Ginger Herget and Adrian Herget, who are the daughter and grandson of Personal Representative Nellie Herget. Although Ginger Herget's signature also appears on the Codicil as a notary, the Caveator opined that, even if the Testator "mighta had somebody drive her" to Essex to sign the Will in February, he simply did not believe anyone did so for the Codicil.

At that point in the hearing, counsel for the Caveator argued to the court: "[W]e have shifted the burden to prove the validity of the" Codicil to the Personal Representatives. Citing Md. Code (1974, 2017 Repl. Vol.), § 4-102 of the Estates and Trusts Article ("E.T."), counsel contended that, because the newly found copy of the Codicil was "not witnessed," and even if it was, "lacks the attestation clause[,]" the Caveator had met his "burden of proving this document is facially invalid, and the burden has now switched to the [Estate] to show . . . that this is a valid instrument."

Counsel for the Estate opposed the motion, arguing that "the proper parties to shift the burden would have been the witnesses or the notary named and not a person who was

6

not there[.]" Moreover, "the formalities of an attestation clause [are] not meant to defeat the purpose and the intent of the Testator," as "effectuated in the *In Witness Whereof, I have subscribed my name below*" language of the Codicil "indicat[ing] that it has been witnessed and then the witnesses signed the[ir] name." All "they've produced[,]" counsel for the Estate pointed out, "is a copy of a [Codicil] signed by the Testator prior to being witnessed" and testimony from the Caveator that he did not "think she would have drove down there," which is not enough to "give[] rise to the burden shifting meant under the statute[.]"

The circuit court "disagree[d] that the burden has been shifted at this point[,]" explaining:

> The burden is still with the moving party [*i.e.*, the Caveator] to establish that there are reasons why this holographic codicil should not be recognized by the Court. It was recognized by the Orphans' Court and by not having an attestation clause to the codicil, . . . still does not, in and of itself, express that this was not the clear intent of the Testatrix in this case.

Counsel for the Caveator persisted in arguing that the "second document" he found in the Testator's house cast doubt upon the due execution of the Codicil because the second document—though signed by the Testator—lacked witnesses and a complete attestation clause. But the court pointed out "that [second document] may be a draft copy[,]" and, the court observed that, "if you're challenging the validity of those signatures" on the fully signed Codicil, "you would need more than just saying I found an unsigned copy. You'd have to have these individuals that would say that this is not my signature." Counsel for the Estate agreed that the burden would not shift "without those necessary witnesses[,]" because the Testator could "sign and then acknowledge [to the witnesses] that she signed

7

[the Codicil.]" "Simply finding an unsigned draft of that document" without any witness signatures, the court explained, did not "absolve" the Caveator of his "responsibility to show the invalidity of those signatures; most importantly, the signature of the Testatrix in this case."

When proceedings resumed after a short recess, the Caveator presented additional testimony and medical records regarding the health of the decedent. The Caveator recounted that, at the hearing before the orphans' court, Krystal Vogtman testified that the Testator signed the Codicil on June 5 "in Baltimore[.]" Yet, when the Caveator saw the Testator on May 24 for her birthday, her condition was "[n]ot good at all" because her cancer was "back" and "[s]he was on chemotherapy." "She was in a wheelchair" and suffered "[e]xtreme fatigue." He asserted that, according to hospital records admitted into evidence, on May 28, 2020, "[h]er recent physical and mental decline ha[d] prohibited her from driving on her own." On June 2, 2020, just three days before she signed the Codicil, "[s]he had 7,700 milliliters drained" in a paracentesis procedure.[1]

---

[1] We take judicial notice that paracentesis is commonly an outpatient medical procedure, performed with local anesthesia while the patient is awake, "to remove extra fluid from [the patient's] belly (abdomen). . . . If the fluid buildup is causing discomfort or pain, all of the fluid may be drained." https://johnshopkinsibportal.stay wellsolutionsonline.com/Library/HealthSheets/3,S,40924 (last visited June 15, 2022). *See generally* Md. Rule 5-201(a)-(c) ("A court may take judicial notice" of a fact that is "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); Md. Rule 5-201(f) ("Judicial notice may be taken at any stage of the proceeding."). *Cf. Abrishamian v. Washington Med. Grp., P.C.*, 216 Md. App. 386, 414 (2014) (recognizing that "the categories of adjudicative facts susceptible to judicial notice" include "medical" facts); *Lerner v. Lerner Corp.*, 132 Md. App. 32, 40 (2000) ("[A]n appellate court may take judicial notice.").

8

The court questioned the Caveator, asking whether he saw his "mother on June 5th, 2020[,]" or "the day before" or "the day after[.]" The Caveator answered: "No, I didn't." But he added that he had "talked to her . . . on June 2nd when she was getting operated on." He further testified that "she wasn't driving [herself] for the last six months" before she died, but then acknowledged that she "was paying people, acquaintances, for rides[.]"

Joan Romanik, the Caveator's fiancée, testified that the Testator "was really sick" in May 2020 and had not been driving herself for a year before her death.

Following testimony from those two witnesses, counsel for the Caveator renewed his argument that "we have proven enough that the burden has shifted to the" Estate. In counsel's view, they had triggered that shift by producing "a document in evidence which is unwitnessed" and "lacks the proper attestation[,]" as well as testimony that the Testator "was very sick[,]" so she "couldn't drive" and that the "ride" from Grantsville to Essex, where the Codicil was allegedly executed, was "arduous[.]"

Counsel for the Estate responded that "the burden has not shifted and continues to be with the" Caveator. In support, counsel pointed out that "the issue of whether she drove down or whether somebody drove her down" was not resolved because "[t]here has been nothing presented whatsoever to challenge that this was not [sic] a validly executed and witnessed [Codicil] and notarized, to boot[.]" Given the "testimony that she paid people for rides" and the evidence that "[s]he ended up wherever the witnesses were or the witnesses ended up wherever she was[,]" the appeal to the circuit court should "be dismissed[.]"

9

The court denied the Caveator's renewed motion to impose the burden of proving the validity of the Codicil on the Estate, pointing out that "[t]here's been no testimony other than . . . conjecture" by the Caveator and his fiancée, neither of whom was "present on the date" the Codicil was signed. The court ruled that the "unsigned copy, . . . purportedly found at the residence of" the Testator was "insufficient to shift the burden[.]"

When the court asked counsel for the Estate whether he would "put on a case," counsel answered that they were "seeking a dismissal" and that, although he had "witnesses here[,]" he was "not going to offer any testimony that any of them drove her down that day or saw her driving down, so I don't know that it would be relevant as far as that issue is concerned[.]"

At the Caveator's request, his counsel then "reiterate[d] that Ms. Vogtman did testify" in the orphans' court "that the decedent did drive herself down from Baltimore" even though "the evidence shows that is virtually impossible given her medical condition[.]" Counsel then argued that, given that the Codicil lacks an attestation clause, and that the copy of the document found by the Caveator was "simply signed and not witnessed," "this [C]odicil is not a valid instrument[.]"

Counsel for the Estate countered that, in this "*de novo* hearing[,]" the "proof" from the orphans' court hearing "isn't before the court[,]" and based on "the brief testimony of the two witnesses[,]" the Caveator failed to show that it was not possible that the Testator "drove herself down or somebody else drove her."

The court found "that it is a valid Will and [C]odicil dated June 5th, 2020, in this case, and the appeal is denied[.]" In support, the court reasoned:

10

[I]n reviewing this case, which is a *de novo* appeal, the challenge is . . . to the [C]odicil . . . dated June 5th, 2020. **The copy which was presented to the Orphans' Court, which the Court has in its file, is signed by the Testatrix, witnessed, and notarized, and with respect to those signatures, there is a presumption that those are valid signatures unless there is some evidence to the contrary.**

In this matter, the only testimony that we've had is from the . . . Testatrix's only child, Harold William Steiner, and his fiancée, Joan Romanik. Both parties testified that Ms. Theresa Ruth Steiner was incapable of driving down to Essex where we're presuming this . . . was signed, but there's really been no evidence that that's actually where it was signed. It was apparently signed in the state of Maryland because we have a Maryland notary on this document and witnessed, but we don't know whether . . . she was driven to Baltimore, whether Ms. Steiner met them halfway. We simply don't know, and there's been no testimony to that point.

The only testimony we have is that . . . neither one of [the two testifying witnesses] actually witnessed or saw Theresa Ruth Steiner on the date in question, which is June 5th, 2020. So they have no direct testimony or any observations of the signing of this document or the lack of signing of this document. They simply don't know, through no fault of their own. They testify to a number of presumptions they make from her general physical state, which were [medical records] admitted into the record as Plaintiff's Exhibits 2 and 3, which were admitted as business records, but there's been no testimony from any medical professional as to the accuracy of those documents. They were simply entered as a business record, and the Court treats them as such.

The alleged statements at the Orphans' Court hearing by Ms. Vogtman were simply hearsay, and we don't have those parties here testifying, so, really, what we have is, clearly, a concerned son and his fiancée about their mother's last wishes, but they have failed to meet their burden to overcome the presumption that these are valid signatures on this [C]odicil.

With respect to the attestation clause . . . not being present, the document in question here, the alleged [C]odicil, which currently shows the intent and the desire of the Testatrix in this case, which is the primary concern of the estate and trust laws to do what the testator or testatrix desires to do with their property.

**There's been no legitimate or clear challenge to the signatures on this document. There's been no direct testimony as to the validity of this**

**document, and the Court finds that the [Caveator] has failed to meet the burden of proving that this was not a valid document in this case or that the decedent did not possess the necessary mental capacity on the specific date of June 5th, 2020, to make the decision to sign the [C]odicil.**

(Emphasis added.)

The Caveator noted this timely appeal.

## LAW GOVERNING REVIEW OF TESTAMENTARY INSTRUMENTS

The requirements for legal execution of testamentary instruments are governed by § 4-102(b) of the Estates and Trusts Article, which provides (with exceptions and alternatives not relevant here):

> (b) [E]very will shall be:
>
>> (1) In writing;
>>
>> (2) Signed by the testator . . . ; and
>>
>> (3) Attested and signed by two or more credible witnesses in:
>>
>>> (i) The physical presence of the testator[.]

E.T. § 4-102(b).

The party seeking to probate a will or codicil bears a threshold "burden of proving the existence of these elements, by a preponderance of the evidence," *Groat v. Sundberg,* 213 Md. App. 144, 152 (2013), but, as the Court of Appeals explained in *Castruccio v. Est. of Castruccio*, 456 Md. 1, 17-18 (2017), a "presumption of due execution" can be found to exist under circumstances the court discerns from the document itself:

> One way to establish the validity of a will is through an attestation clause in the will itself. "An attestation clause is a 'provision at the end of an instrument (esp. a will) that is signed by the instrument's witnesses and that recites the formalities required by the jurisdiction in which the instrument might take effect (such as where the will might be probated).'"

12

*Slack v. Truitt*, 368 Md. 2, 8 n.5 (2002) (quoting *Black's Law Dictionary* 124 (7th ed. 1999)). "[A]n attestation clause reciting facts necessary for the valid execution of a will is *prima facie* evidence of the due execution of the will, if it bears the genuine signatures of the testator and subscribing witnesses." *Van Meter v. Van Meter*, 183 Md. 614, 617-18 (1944). Furthermore, **"a presumption of due execution attaches to a will that contains the testator's signature and an attestation clause signed by the witnesses."** *Slack*, 368 Md. at 7-8 (footnote omitted). "[O]nce the presumption attaches, the burden of proof is on the caveator to show by clear and convincing evidence that the facts stated in the attestation clause are untrue." *Id*. at 8 (footnote omitted).

On the other hand, **an attestation clause is not a requirement for a valid will.** *See id.* at 8 n.5 ("A formal attestation clause is not an essential part of a will."); *Van Meter*, 183 Md. at 617 ("The validity of the execution of a will depends, not upon an attestation clause, but upon conformity of the execution with the requirements of the statute, and also the testimony of the subscribing witnesses if they are produced and examined."). **Nor is an attestation clause required in order to establish the presumption of due execution.** *See Slack*, 368 Md. at 12 ("[A]n attestation clause is not the *sine qua non* of the presumption of due execution."). **"[I]n the absence of an attestation clause, <u>if a proponent of a testamentary document can adduce sufficient evidence from the document and/or surrounding circumstances</u> to make a *prima facie* case for the satisfaction of the statutory requirements for execution of a will, <u>the presumption of due execution attaches</u>."** *Groat*, 213 Md. App. at 156-57. Thus, a proper attestation clause in a will is itself sufficient to establish a *prima facie* case for the validity of the will, but is not necessary to do so.

(Emphasis added.)

The Court of Appeals consistently has recognized "the established rule in this State that a will and codicil are to be construed together as one instrument and reconciled as far as practicable." *Matter of Albert G. Aaron Living Tr.*, 457 Md. 699, 719 (2018) (quotation marks, emphasis, and citation omitted).

We review the circuit court's decision regarding the validity of the Codicil "on both the law and the evidence." Md. Rule 8-131(c). Although the interpretation and

13

enforcement of a testamentary instrument is a legal determination that we review *de novo*, we "will not set aside the judgment . . . on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id*. *See Albert G. Aaron Living Tr.*, 457 Md. at 707.

## DISCUSSION

### I. Burden of Proof Challenges

The Caveator contends that the circuit court "erred in placing the burden on [him] to show the invalidity of the Codicil. This error occurred in the initial placement of the burden on [him] and continued when the [c]ourt gave the Codicil a presumption of validity despite the lack of an attestation clause." In support of this contention, he cites the circuit court's comments (which we have quoted above) in the course of ruling on his requests to assign to the Personal Representatives the burden of proving the validity of the Codicil. The Caveator asserts that the court's remarks establish that the court erroneously and "repeatedly stated that the burden was placed on [him] from the beginning of the trial and that this burden . . . never shifted." The Caveator argues that, as in *Groat,* 213 Md. App. 144, the burden remained on the Personal Representatives to prove the Codicil's validity because the presumption of due execution did not attach to the Codicil.

In response, the Estate contends that the circuit court did not err in finding, based upon the document itself and/or surrounding circumstances, that the challenged Codicil was entitled to a presumption of due execution, and then ruling that the Caveator failed to overcome the presumption by clear and convincing evidence. Despite the lack of a formalized attestation clause, the Estate contends, the court correctly found the Codicil

14

presumptively valid based on the "In Witness Whereof" language that was followed by the signatures of the Testator, two witnesses, and a notary. Citing *Castruccio* and *Slack*, the Estate argues that "the Codicil offers greater reliability than" the probated documents in either of those cases.

We agree with the Estate that *Slack*, *Groat*, and *Castruccio* offer instructive comparisons. Applying lessons from those decisions, we will explain why they support the circuit court's judgment in this case.

### *Slack v. Truitt: "Witnessed By" Attestation of Holographic Instrument*

In *Slack*, the Court of Appeals affirmed this Court's decision that the presumption of due execution applied to a holographic will signed by two witnesses in the testator's presence, even though one witness testified that she did not know she was signing a will and could not recall seeing the testator's signature on it. A couple of hours before Dale Slack committed suicide, he asked his neighbor Dorothy Morgan to sign a one-page handwritten document. 368 Md. at 4-5. Morgan signed the document, not noticing either that it was a will or whether Slack had signed his name. *Id.* Five minutes later, Slack returned to ask Morgan's daughter, Sandra Bradley, to sign the same page, and the daughter did so, noticing that Slack had already signed. *Id.* at 5.

Neither the orphans' court nor the circuit court admitted Slack's holographic will to probate. *See id.* at 6. This Court reversed, holding that the testator had "'acknowledged the document as his own'" by handing Morgan and Bradley "'a document in his handwriting and asking them with apparent authority to sign it.'" *Id.* at 6-7 (quoting *Truitt v. Slack*, 137 Md. App. 360, 367 (2001)). "'While the witnesses' attestations were hurried

15

and careless,'" we concluded that "'they were sufficient under [E.T.] § 4-102.'" *Id*. at 7 (citation omitted).

The Court of Appeals affirmed, deciding that, under the circumstances, "the presumption of due execution arises notwithstanding the absence of an attestation clause." *Id*. at 10, 12. Recognizing that it had "not [previously] addressed the question[,]" the Court agreed "with the reasoning of those courts that hold that **an attestation clause is not the *sine qua non* of the presumption" of due execution. A will "subscribed by two witnesses, both of whom signed their name following the word 'witnesses[,]'" also "facially [bears] every indicia of validity**." *Id.* at 10, 12, 16 (emphasis added; citations omitted).

The Court in *Slack* expressly relied on two out-of-state cases it found persuasive which had held that, even if attesting witnesses are "unable to testify or recollect, it is proper to apply the presumption of due execution" based on their "witnessed by" attestation. *Id.* at 15. Writing for the Court of Appeals, Judge Irma S. Raker explained:

> In *Mead v. Trustees of the Presbyterian Church*, 229 Ill. 526, 82 N.E. 371 (1907), the Supreme Court of Illinois reviewed a will that contained no attestation clause but was signed by the testator and two witnesses. Neither witness could recall anything about the circumstances under which they had signed the writing. The court held that, under certain circumstances, an attestation clause was not necessary to give rise to the presumption of validity:
>
> > "In this case . . . the witness Boswell wrote immediately after his name the word 'witness,' which shows clearly he understood that he was witnessing the execution of the instrument which he had signed as a witness, and [ditto marks] following the name of Paul and appearing immediately underneath the word 'witness,' show that witness also understood he was signing as a witness to the execution of the

16

instrument. It was not necessary that a formal attestation clause reciting all the facts necessary to a correct execution of the will be added to the instrument to make it a valid will."

*Id*. at 373; *see also* Annotation, *Presumption as to Due Execution of Will From Attestation, With or Without Attestation Clause*, 76 A.L.R. 617, 622 (1932) (noting that there is "held to be a presumption of proper execution even though there is no attestation clause, where the attestation is merely by subscription, or followed by the word 'witnesses.'"); *German Evangelical Bethel Church v. Reith*, 327 Mo. 1098, 39 S.W.2d 1057, 1062 (1931) (noting that "[b]y subscribing the will the attesting witnesses *impliedly* vouch for its due execution as fully or as broadly as they would do expressly if there were a complete attestation clause, though, perhaps, with less force and emphasis.").

Similarly, in *In re Pitcairn's Estate*, 6 Cal.2d 730, 59 P.2d 90 (1936), the California Supreme Court held that the presumption of due execution should not be limited to wills containing an attestation clause. Pitcairn's will was challenged on the grounds that the will was not executed with the formalities required by the statute. The court noted that it had before it "a case where the signatures of the testatrix and subscribing witnesses are genuine; the will is attested, but lacks a formal attestation clause reciting the steps in execution; the attesting witnesses, seemingly adverse but uncontradicted on the essential issues, testify to a technical failure to comply with the formalities of execution." *Id*. at 92. The issue was whether the trial court could admit the will to probate. The court held that it could.

The court began its analysis with a restatement of the "well established [rule] that a regular and complete attestation clause makes out a *prima facie* case of due execution of the will." *Id*. In rejecting the argument that the presumption is limited to cases where a full attestation clause is contained in the will, the court said:

> "In our view the distinction thus drawn is illogical and the rule is too narrow. There is no need of an 'attestation clause;' it is sufficient that a will be witnessed or attested, and the recital of the steps in execution is not required. It does not seem reasonable, therefore, to have the important presumption of due execution turn upon the presence or absence of this unnecessary provision. The foundation of the presumption is the proof of genuineness of the signatures, for the instrument is then on its face a valid will. Doubtless recitals in an attestation clause are entitled to greater weight, but the logical

17

> basis for the presumption, as well as its practical necessity, is the same whether or not there is such a clause. This view has the support of a number of authorities."

> *Id.* The court [in *Pitcairn's Estate*] affirmed the judgment admitting the will to probate. *Id*. at 93.

*Slack*, 368 Md. at 10-12.

Following the reasoning in *Mead* and *Pitcairn's Estate*, the Court of Appeals held that Slack's holographic will "bears on its face every indicia of due execution" because (1) it "consists of a single page, written entirely in the testator's handwriting, and bearing the signature of the testator and two witnesses" who signed "beneath the words 'Witnessed By[,]'" and (2) the testator adequately acknowledged his testamentary intent through his conduct, by presenting the signed and handwritten document to the two witnesses while asking each to sign it. *Id*. at 12.

Despite Morgan's testimony that she did not look at the document or remember whether Slack's signature was there when she signed it, the Court held that the presumption of due execution attached to the will. *Id*. at 14-15. The evidence did "not suggest that [Slack] had not signed the will prior to Morgan's signing it[,]" but instead, simply indicated "a failure to remember" his signature. *Id*. at 15.

Nor did Morgan's inability to supply "'facts necessary to a correct execution of the will'" constitute clear and convincing evidence defeating "the presumption of due execution that attache[d] to the will" based on such "witnessed by" attestation. *Id.* at 10, 17-18 (quoting *Mead*, 82 N.E.2d at 373). The Court in *Slack* reasoned: "[I]f subscribing witnesses were required to recollect all the formalities prescribed by statutory

18

requirements, few wills would be immune to attack, particularly after the passage of many years." *Id*. at 16.

***Groat v. Sundberg: Unattested Codicil***

In *Groat*, 213 Md. App. at 147, this Court held that a presumption of due execution did not attach to a typed, one-page document that had neither a formal attestation clause *nor any other* "witnessed by" verbiage. In addition to the lack of attesting language in the document, the alleged witness could not recall whether she was in the same room as the testator when she signed her name on the document. The document, alleged to be a codicil dated January 21, 2010, would have revoked a bequest of stock in a limited liability company to two individuals named in a will that had been executed by the testator, Frank Halgas ("Frank"), on August 16, 2006. *Id*. at 147-48.

The two-sentence document alleged to be a codicil stated: "'Upon my death I will transfer all of my stock to Irv Groat for the sum of $10,000.00. A copy of the check should be furnished to [the company] to initiate transfer.'" *Id.* at 148. Frank and Groat signed on lines next to their typed names. *Id*. Underneath those, the other purported witness, Frank's niece, Melissa Halgas ("Melissa"), signed her name. *Id*. No text or signature line accompanied her signature. *Id*.

In the orphans' court, Groat testified that he and Frank signed three copies of the document in each other's presence. *Id*. at 149. Frank told Groat to leave the copies on the desk "'in his den where he was spending most of his time[,]'" that "'he would have [Melissa] sign them[,]'" and that he would call "'when that was accomplished.'" *Id*.

Melissa testified that "she had a conversation with" Frank on January 15, 2010, "about 'his intention to . . . transfer the stock to [Groat], instead of following the Will as it was written.'" *Id.* She "came back two weeks later, . . . around February . . . 5th [or] 6th" and signed three copies of the document that had already been signed by Frank and Groat. *Id.* at 149-50. Melissa admitted that she did not remember whether the copies were on Frank's desk in the room where he was sitting, or in the kitchen. *Id.* at 150-51. She conceded that she could not recall whether she signed the document in Frank's presence, telling the court: "To be honest with you, I don't recall if I signed it in his presence or not." *Id.* at 150 (emphasis omitted).

The orphans' court found that the document was not a valid codicil because Melissa's testimony was "'inadequate'" to satisfy "'the witnessing requirements for testamentary documents under [E.T.] § 4-102[.]'" *Id.* at 151. This Court affirmed that decision, emphasizing: "Unlike *Slack*, *the words 'witness,' 'witnessed by,' or some other variation do not appear anywhere on the Document, much less next to the signatures* of [either Groat or Melissa]." *Id.* at 157 (emphasis added). We pointed out that there was "nothing on the Document to indicate that, when [Groat and Melissa] signed" it, "they were attesting" that they saw "'those things exist and are done which the statute requires.'" *Id.* at 157 (quoting *Van Meter*, 183 Md. at 619).

Because Melissa "could not testify that the statutory requirement of her signing as a witness *in the presence of* [*the testator*] had been done, . . . she could not attest to the due execution of the Document." *Id.* at 159 (emphasis added). "There being no other evidence of [the witness]'s signing the Document in the presence of [the testator]," we concluded

20

"that there was insufficient evidence to establish a *prima facie* case of due execution of the Document as a codicil, and thus the presumption of due execution did not attach." *Id*. We held that the orphans' court did not err in relying on the witness's inability to remember a key fact regarding the execution of the instrument as grounds for finding that Groat failed to prove the statutory requirements for probate of the alleged codicil. *Id.* at 159-60.

We distinguished the facts in *Groat* from those in *Slack*, where "the presumption of due execution *had already attached* to the document" because of *other evidence* of due execution, and therefore, "the witness's lack of memory [in *Slack*] did not *overcome* that presumption." 213 Md. App. at 160. In contrast, in *Groat*, because the document and surrounding circumstances did *not* support "a presumption of due execution, the orphans' court was free to base its decision on [the witness]'s testimony that she did not recall whether she signed" the codicil in the testator's presence, and our Court would not consider the finding based upon that evidence clearly erroneous. *Id*. at 161.

### *Castruccio v. Estate of Castruccio: Presumption of Due Execution Without Attestation Stating That Witness Signed in Presence of Testator*

In its most recent attestation case, the Court of Appeals held that the presumption of due execution attached to the witnesses' statement attesting that the testator signed the will even though it was on a separate page and did not expressly state that the witnesses signed in the presence of the testator. In *Castruccio*, 456 Md. 1, Sadie, wife of testator Peter Castruccio ("Peter"), disputed the validity of his will leaving all but three cash bequests to his longtime employee Darlene Barclay ("Darlene"). *Id*. at 9. To prevent Sadie from passing his estate on "to certain family members of whom he did not approve[,]"

21

Peter, with his attorney's assistance, changed his will to provide that if, "at the time of [his] death, [his] beloved wife [did] not have a valid Will filed with the Register of Wills[,]" he would "give, devise and bequeath all the rest and residue of [his] Estate and property" to Darlene. *Id.* at 10 & n.2.

Peter signed the new will in the presence of three witnesses, beneath a clause asserting that he "set [his] hands and seals to this six page instrument, and have initial [sic] each page hereof, which instrument is intendant [sic] to be my Last Will and Testament, this 29<u>th</u> day of September, 2010." *Id*. at 11. He signed under seal, but without initialing any of the pages. *Id.*

Below Peter's signature, the following witness attestation clause began, with the first two lines appearing on page 5, and the remainder on page 6: "'I do hereby attest that the testator [sic] to be of sound mind, fully able to understand this instrument, and the testator voluntarily and freely did sign same.'" *Id*. Each witness signed his or her name "under the word 'WITNESS:' and above a line that reads, 'Signature, residing at:[.]'" *Id*. Below each signature is either a typed or handwritten address. *Id.*

Sadie, who had not filed a will before Peter died, caveated the 2010 will which left his residuary estate to Darlene. *Id*. at 12. After the orphans' court transmitted seven issues to the circuit court, the parties filed cross-motions for summary judgment. *Id*. at 12-13. Sadie challenged the facial validity of the witness attestations on several grounds, including that they were not on the same page as the testator's signature or otherwise affixed to that signature page, and that the witnesses did not expressly attest that they signed in the presence of the testator. *Id*. at 19-20.

22

The circuit court held that the issue was not whether "'all of the pages were mechanically affixed to each other[,]'" but instead, "'whether the document purporting to be the will holds together as the unitary document completed by the testator and signed by the witnesses[.]'" *Id*. at 14. The court found that, because "the 2010 Will contained a proper attestation clause, . . . the presumption of due execution attached[,]" and that "Sadie had not presented clear and convincing evidence to overcome the presumption." *Id*. at 15. This Court affirmed in a reported opinion. *See id.; Castruccio v. Estate of Castruccio*, 230 Md. App. 118 (2016), *aff'd*, 456 Md. 1, 14-15 (2017).

The Court of Appeals agreed, holding that signatures of witnesses need not be on the same page as the testator's signature and that an attestation need "not recite the statutory requirement that the witnesses signed the Will 'in the presence of the testator.'" *Castruccio*, 456 Md. at 31. *See also id.* at 29. Citing *Slack* and other decisions, the Court noted that it "is generally reluctant to impose formalities beyond those specifically required by statute" and that "the testator's intention that the document act as his will is paramount." *Id*. at 28. Even though attesting language in a will, "standing alone," may "not provide prima facie evidence of the validity of the Will[,]" *id*. at 31, "'if a proponent of a testamentary document can adduce sufficient *evidence from the document and/or surrounding circumstances* to make a *prima facie* case for the satisfaction of the statutory requirements for execution of a will, the presumption of due execution attaches.'" *Id*. at 32 (emphasis added) (quoting *Groat*, 213 Md. App. at 156-57 (citing *Slack*, 368 Md. at 12)).

23

In analysis that will frame our discussion of the issues raised by the Caveator, the Court of Appeals in *Castruccio* compared Peter's new will to the testamentary documents in *Groat* and *Slack*, and explained why the evidence supported the circuit court's application of the presumption of due execution to the will:

> In this case, the circuit court did not err in finding "sufficient evidence from the document and/or surrounding circumstances to make a *prima facie* case for the satisfaction of the statutory requirements for execution of a will," [*Groat*, 213 Md. App.] at 157, and thus properly found that the presumption of due execution attached to the 2010 Will. Although the attestation clause itself is imperfect, each of the three witnesses signed their names under the word "WITNESS:." *Cf. Slack*, 368 Md. at 12 (that "[t]he two witnesses, in the presence of the testator, signed beneath the words 'Witnessed By'" provides an indication of due execution). The witnesses' signatures all appear on the same page, which is the next consecutively numbered page following the one that contains the testator's signature. *Cf. id.* (that the testator's signature "was nearly adjacent to the signatures of the witnesses" provides an indication of due execution). Additionally, the imperfect attestation clause includes a recitation of some (though not all) of the statutory requirements for execution of a will, including witnessing Peter sign the will and a statement of Peter's testamentary capacity.
>
> Furthermore, the "surrounding circumstances" in this case provide additional evidence of satisfaction of the statutory requirements. All three witnesses testified that they observed Peter sign the 2010 Will, that he declared the document to be his will, and that they all signed the Will in his presence and in the presence of each other. *See Van Meter*, 183 Md. at 617 ("The validity of the execution of a will depends, not upon an attestation clause, but upon conformity with the requirements of the statute, and also the testimony of the subscribing witnesses if they are produced and examined."…).
>
> Therefore, based on the document itself and the circumstances surrounding its execution, we conclude that the circuit court did not err in finding sufficient evidence "to make a *prima facie* case for the satisfaction of the statutory requirements for execution of a will," *Groat*, 213 Md. App. at 157, and thus finding that the presumption of due execution attached to the 2010 Will.

*Id*. at 32-33 (emphasis omitted).

24

Relying on *Groat*, the Caveator contends that the circuit court erred in "repeatedly" placing the burden on him "from the beginning of the trial" and ruling "that this burden … never shifted." After examining the full record, we are not persuaded that is what happened. To the contrary, we conclude that the circuit court made a threshold ruling that the dated and signed Codicil was *prima facie* valid, and then found that the Caveator failed to overcome the resulting presumption of due execution. We discern no error in either decision.

### *Prima Facie Validity*

The Caveator argues that "[t]he [c]ircuit [c]ourt erred in placing the burden of proving the invalidity of the Codicil on" him from the outset, particularly "given the lack of an attestation clause[.]" We disagree.

As in *Castruccio* and *Slack*, the circuit court found sufficient evidence, both from the Codicil itself and from other circumstances surrounding it, to establish a *prima facie* case that the statutory requirements governing execution of testamentary instruments were satisfied. *See Castruccio*, 456 Md. at 32; *Slack*, 368 Md. at 12. The Codicil is handwritten in block printed letters that are consistent over two consecutively-numbered pages. "PAGE 2 of 2" contains substantive testamentary language consisting of two bequests. Both of the witnesses' signatures and the Testator's signature all appear on the same page below language attesting "In Witness Whereof, I have subscribed my name below, This 5th day of June, 2020," and next to descriptive labels stating either "Witness Signature" or "Testator Signature[.]"

25

In addition to this attestation by signators identified as witnesses, the Codicil bears several other "indicia of validity" on its face. *See Slack*, 368 Md. at 15-16. The text of the Codicil reflects the testamentary nature of the document, which referred to the unchallenged Will. The circuit court was obligated to "construe [the Will and Codicil] together as one instrument[,]" "reconcil[ing] [them] as far as practicable." *Albert G. Aaron Living Tr.*, 457 Md. at 719 (emphasis omitted). The Testator's revised bequests in the Codicil went to persons who had previously been named as beneficiaries in the Will she had undisputedly signed four months earlier. Moreover, Adrian Herget, who witnessed the Codicil, also witnessed the Will, signing in what appears to be the same hand, beneath a full attestation clause stating that the Will

> was signed in our sight and presence by Theresa R.B. Steiner (the "Testator"), who declared this instrument to be his/her Last Will and Testament and we, at the Testator's request and in the Testator's sight and presence, and in the sight and presence of each other, do hereby subscribe our names as witnesses on the date shown above.

Likewise, Ginger Herget, who signed the Codicil as a notary, had also signed as a witness to the execution of the Will below the same attestation clause and in handwriting consistent with her notary signature on the Codicil.

*Slack* and *Castruccio* both held that the presumption of due execution does not depend on the presence of a formal attestation clause that recites all of the statutory requirements for executing a testamentary instrument. *See Castruccio*, 456 Md. at 32; *Slack*, 368 Md. at 16. Instead, a testamentary instrument may be facially valid, giving rise to a presumption of due execution, when "subscribed by two witnesses, both of whom signed their name following the word 'witnesses.'" *Slack*, 368 Md. at 16 (citing *Mead*, 82

26

N.E. at 372). Such language is sufficient to "'show that [the] witness also understood he [or she] was signing as a witness to the execution of the instrument.'" *Slack*, 368 Md. at 10 (quoting *Mead*, 82 N.E. at 373). *See Castruccio*, 456 Md. at 32. "'[B]y subscribing the will, the attesting witnesses *impliedly* vouch for its due execution as fully or as broadly as they would do expressly if there were a complete attestation clause, though, perhaps, with less force and emphasis.'" *Slack*, 368 Md. at 10-11 (quoting *German Evangelical Bethel Church*, 39 S.W.2d at 1062).

Here, the Codicil bears attestations of two individuals who indicated that they were each signing the document as a "Witness." One of those witnesses was a person who, just four months earlier, attested to witnessing that all of the statutory requirements were satisfied when the Testator signed her Will. The Codicil is handwritten and bears the Testator's signature, which matches her signature that appears beneath a full attestation clause in the Will. The Codicil was notarized by the same person who served as the second witness for the Will. All signatures on the Codicil appear on a single page that begins with bequests to individuals whom the Testator previously named as beneficiaries under the Will. And, although hospitalized one week before her death, the Testator had retained a signed but undated and unwitnessed copy of that Codicil among her papers at her home. These factual circumstances materially distinguish this case from *Groat*, wherein the typed document lacked comparable language, history, and witness labels.

Nor did the lack of corroborating testimony from the two subscribing witnesses preclude the presumption of due execution from attaching to the Codicil. Although this case differs in that regard from *Slack* and *Castruccio*, where attesting witnesses testified,

27

the Court of Appeals has recognized that, even when attesting "witnesses are unable to testify or recollect, it is proper to apply the presumption of due execution" because, "if subscribing witnesses were required to recollect all the formalities prescribed by statutory requirements, few wills would be immune to attack, particularly after the passage of many years." *Slack*, 368 Md. at 15-16 (citing *Pitcairn's Estate*, 59 P.2d at 90). The rebuttable presumption that attesting witness signatures are valid protects the Testator's intent from being defeated by time and circumstances beyond her control. *See id.* Consequently, we conclude that testimony from the two attesting witnesses was not required to establish a *prima facie* case that all the statutory requirements for executing a testamentary instrument were satisfied.

As *Slack* and *Castruccio* make plain, a court may find that an instrument is facially valid, and therefore entitled to the presumption of due execution, even when: an attesting witness cannot recall whether the testator had already signed the document, as in *Slack*; or the witness cannot recall signing in the presence of the testator, as in *Castruccio*; or no witness can recall any of the circumstances surrounding execution, as in *Mead*; or all witnesses testify adversely to their attestations, as in *Pitcairn's Estate*. We conclude that the circuit court did not err in finding that the presumption of due execution applies in this case even though neither witness to the Codicil was called to testify at the caveat hearing.

Here, as in *Slack* and *Castruccio*, and in contrast to *Groat*, the circuit court determined that the Codicil was *prima facie* valid, even though it does not contain an attestation clause, because it was "signed by the Testatrix, witnessed, and notarized[.]" Based on the "presumption that those are valid signatures[,]" the court correctly ruled that

28

the burden was on the Caveator to prove by clear and convincing evidence that the Codicil is invalid.

### *Failure to Prove Invalidity*

The circuit court was not persuaded by the Caveator's evidence that a fraud was perpetrated by the proponents of the Codicil. The court found that the Caveator's evidence failed to prove either that the Testator lacked the mental capacity to form testamentary intent or that she could not have traveled somewhere for the Codicil to be witnessed and notarized.

The circuit court rejected the Caveator's claim that the Testator's medical condition prevented her from making a competent decision to amend her Will. The court cited the Caveator's lack of contact with the Testator on June 4-6, 2020, the days surrounding her execution of the Codicil. After accepting the Caveator's testimony that the Testator's health was deteriorating in the months before her death on September 1, the court noted there was "no testimony from any medical professional" regarding the Testator's medical condition on June 5, 2020. Based on the facial validity of the Codicil and the paucity of evidence that the Testator's medical and mental condition prevented her from forming testamentary intent on the date she signed it, the court did not err in finding that there was insufficient proof that the Testator lacked "the necessary mental capacity on the specific date of June 5th, 2020, to make the decision to sign the [C]odicil."

Likewise, the circuit court did not err in finding that the Caveator failed to prove fraud in the execution of the Codicil. Regarding the Caveator's discovery of a duplicate document, signed but undated and unwitnessed, in the Testator's home the week before her

29

death, the court found as a threshold matter that that document was insufficient to shift the burden of proving validity to the Estate. A comparison of the two documents reveals that, other than the missing date and witness signatures, the two documents are identical—down to misspellings, handwriting, paper, and text formatting. And the fact that the Caveator found the signed-but-unwitnessed copy among the Testator's papers in her house one week before the Testator died could support the inference drawn by the circuit court, *i.e.*, that the Testator intended the fully signed, dated, witnessed, and notarized Codicil to be effective. *Cf. Slack*, 368 Md. at 17 (concluding that discovery of signed and witnessed will in the testator's home did "not suggest that there was any fraud worked upon the testator" but instead "that the testator thought it was a valid will").

With respect to the Caveator's assertion that the Testator, witnesses, and notary did not execute the Codicil in each other's presence because, Caveator believed, the Testator's health prevented her from traveling to Baltimore for it to be signed, the circuit court pointed out that there was no direct evidence of where the Codicil was signed, and the evidence on that point was at best inconclusive. The court pointed out that "we don't know whether [the Testator] was driven to Baltimore, whether [she] met them halfway[,]" because there was no "evidence that that's actually where it was signed."

Given the court's conclusion that the presumption of due execution should apply, the court did not err in finding that the Caveator "failed to meet the burden of proving that this was not a valid document[.]" As in *Slack* and *Castruccio*, the evidence presented by the Caveator was not sufficiently clear and convincing to overcome the presumption.

30

Based on this record, we hold that the court did not err in ruling that the Caveator failed to meet his burden of proving that the Codicil was invalid.

## II.     Reliance on Orphans' Court Finding of Validity

The Caveator contends in the alternative that the circuit court erred as a matter of law "in relying upon the prior finding of the orphans' court that the Codicil was valid[.]" (Capitalization altered.)  The Caveator states in his brief:

> The [Circuit] Court stated, when denying Appellant's Motion to shift the burden to the Appellee, that it relied on the Orphans' Court's finding that the Codicil was valid.  Md. Code Ann., Cts. & Jud. Proc. § 12-502 is clear that a de novo appeal shall be conducted ". . . as if there had never been a prior hearing or judgment by the orphans' court."  The Court's reliance on the Orphans' Court's finding is in clear contravention of the statute governing appeals to the circuit courts from final judgments of the orphans' court and constitutes reversible error.

The Caveator does not quote any specific statement made by the circuit court or cite any specific page in the transcript in support of this contention of error.  Regardless, based upon our reading of the entire transcript, we are satisfied that the circuit court did review the Caveator's challenge to the validity of the Codicil *de novo.*

**JUDGMENT OF THE CIRCUIT COURT FOR GARRETT COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**